UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| HON KASSELDER, SPECIAL ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF CURTIS JAMES MEYER;<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF MITCHELL, A MUNICIPAL CORPORATION; RUSSELL STEVENSON, INDIVIDUALLY; LYNDON OVERWEG, INDIVIDUALLY; AND DOES 1-3, INDIVIDUALLY AS POLICE OFFICERS AND ADMINISTRATORS FOR THE CITY OF MITCHELL;<br><br>Defendants. | 4:17-CV-04122-KES<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING IN PART |

Plaintiff, Hon Kasselder on behalf of the estate of Curtis James Meyer, filed a complaint under 42 U.S.C. § 1983 alleging violations of Meyer's civil rights and various state law claims. Docket 1. Defendants City of Mitchell, Russell Stevenson, Lyndon Overweg, and administrators for the City of Mitchell filed a motion for summary judgment claiming qualified immunity. Docket 10.

**FACTUAL BACKGROUND**

Viewing the facts in the light most favorable to the nonmoving party:

In September 2015, Meyer was a resident of Mitchell, South Dakota. Docket 16 ¶ 1. Defendant Officer Stevenson was an officer with the Mitchell Police Department in September 2015. Docket 17 ¶ 1. Meyer had been in an on-again-off-again dating relationship with a woman named Kendra Johnson.

1

Docket 16 ¶ 4. On the afternoon of September 3, 2015, Johnson sent Meyer a snapchat breaking up with him. *Id.* ¶ 6. Meyer was upset and repeatedly attempted to reach Johnson. *Id.*

In the evening of September 3, 2015, Johnson and three of her friends encountered Meyer at a local Mitchell bar. *Id.* ¶ 7. They described Meyer as being very drunk. *Id.* When Johnson and her friends left the bar they offered to drive Meyer home, and he accepted. *Id.* Johnson and her friends then drove Meyer to his home and dropped him off. *Id.* The women then went to 515 North Mentzer Street in Mitchell where Johnson and one of her friends lived. *Id.* ¶ 8. Two other men, including Warren Clark, arrived at the home and a total of five people played music and beer pong in the garage of the house. *Id.* ¶ 8-9.

After getting dropped off at his home, Meyer repeatedly called and texted Johnson but she did not answer. *Id.* ¶ 10. Several of Johnson's friends did answer Meyer's calls and one of Johnson's friends described Meyer as sounding calm, sad, drunk, and insistent on talking to Johnson. *Id.* Eventually, Johnson blocked Meyer's calls. *Id.* Meyer then called one of Johnson's friends. *Id.* The last call he made to Johnson's friend was at 1:48 A.M. on September 4, 2015. *Id.* ¶ 12. At that time, Clark talked to Meyer on the phone and Meyer informed Clark that he was outside the garage. *Id.* ¶ 13. Clark then went outside to talk to Meyer. *Id.* Clark found Meyer sitting alone in the dark by a nearby garage and laid down on the grass to talk to Meyer. *Id.* ¶ 14. While they talked, Clark noticed that Meyer had a gun. *Id.* During the conversation, Clark and Meyer

talked about relationships and Meyer did not make any threats against himself or others. *Id.* ¶¶ 14-15.

On September 4, 2015, Officer Stevenson received a noise complaint for the 500 block of Mentzer Street in Mitchell, South Dakota. Docket 17 ¶ 2. Officer Stevenson was accompanied by Officer Casey Tegethoff as his training officer. *Id.* Both Stevenson and Tegethoff were dressed in standard, dark navy service uniforms with badges and name plates. *Id.* When Officer Stevenson and Officer Tegethoff arrived at the 500 block of Mentzer Street, they identified 515 Mentzer Street as the source of the noise complaint because Officer Stevenson believed there was a house party at the location. *Id.* ¶ 3. As the officers started to approach the home, a flood light in the alley turned on. Docket 13-2 at 3. While the officers waited for the flood light to turn off, Officer Stevenson noticed an older man in a white t-shirt walking down the nearby alley holding a Coors Light in his hand. Docket 17 ¶ 4; Docket 13-2 at 3. The man would later be identified as Warren Clark. Docket 17 ¶ 4. Officer Stevenson and Officer Tegethoff then approached the home. *Id.* ¶ 5.

Officer Stevenson states that he then double tapped his body camera and believed it was recording. A later DCI investigation found that during an independent review of the body camera "no files [were found] in the memory of the camera. . . . [and] finding no files in the camera would indicate the camera had been properly uploaded." Docket 20-4 at 12-13. Officer Tegethoff and Officer Stevenson made contact with several people sitting in the garage of the home. Docket 17 ¶ 6. At this point, Officer Stevenson believed the party was an

underage drinking party. Docket 13-2 at 3. Officer Stevenson asked an attendee where the man in the white shirt went, and the attendee indicated that Clark exited the garage and walked west down the alley. Docket 17 ¶ 8. Officer Stevenson exited the garage to talk with Clark while Tegethoff stayed in the garage. *Id.* ¶ 9. Officer Stevenson found Clark lying in the grass. *Id.* ¶ 9. He approached Clark with his flashlight in his left hand and asked him to come back into the garage, and Clark complied. Docket 16 ¶ 35. He did not identify himself as a police officer to Clark. Docket 13-2 at 3-4. The area in the alley was dimly lit. Docket 16 ¶ 42.

Officer Stevenson asked Clark why he was lying in the grass and he stated that he was talking to his friend. Docket 17 ¶ 10. Clark then pointed out his friend to Officer Stevenson. Docket 20-3 at 21. The friend was Meyer. *Id.* Officer Stevenson would not have seen Meyer without Clark pointing him out because of where Meyer was sitting. Docket 16 ¶ 38. Meyer was reportedly sitting with his legs crossed near the garage. *Id.* Officer Stevenson states that he asked Meyer to come back to the garage and Meyer refused. Docket 20-3 at 21-22. Officer Stevenson states that he then saw the firearm between Meyer's legs. *Id.* at 22.

At this point, Officer Stevenson has provided a few variations of what transpired when Officer Stevenson tried to obtain the gun from Meyer. Officer Stevenson has previously stated that he asked Meyer about the gun "as he was reaching to secure the gun." Docket 20-3 at 22. But he has also claimed that he asked Meyer about the gun and Meyer replied, "That's my forty-five" at

4

which point Meyer began to point the gun toward Officer Stevenson. Docket 13-1 ¶¶ 14-15. And Officer Stevenson has also testified that he told Meyer "give me the gun" or "stop" when Meyer would not let go of the gun. Docket 16 ¶ 47. No one reports hearing Officer Stevenson say anything to Meyer. Docket 17 ¶ 12. And Officer Stevenson acknowledges that he did not identify himself as a police officer to Meyer. Docket 16 ¶ 41. Officer Stevenson also previously said that he did not recall saying anything to Meyer and did not recall Meyer saying anything to him. Docket 16 ¶ 54.

Officer Stevenson and Meyer then struggled for control of the gun. Docket 17 ¶ 15. Officer Stevenson maintains that he could not use his radio because someone else was on the radio. *Id.* at 9; Docket 13-2 at 4. Stevenson has also stated that he did not feel comfortable reaching for his own gun because he thought he would lose control of Meyer's gun. Docket 17 ¶ 15. During the struggle, Meyer was on the ground and Officer Stevenson was either standing over the top of Meyer or kneeling next to Meyer. Docket 13-2 at 6. Officer Stevenson testifies that he eventually felt the grips on the weapon and pulled the trigger. Docket 17 ¶ 20. Officer Stevenson shot Meyer under his chin. Docket 16 ¶ 60. At that point, Meyer fell and released the gun. *Id.* ¶ 21. At 1:52 A.M. Officer Stevenson radioed dispatch, informed them of shots fired, and requested medical assistance. Docket 17 ¶ 21. After the request for assistance, a few officers arrived. Docket 16 ¶ 18. Tegethoff, Clark, and the other partygoers stated that they did not hear anything other than the gunshot. Docket 16 ¶¶ 64-65.

**STANDARD OF REVIEW**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992) (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). On a motion for summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**DISCUSSION**

Kasselder alleges that under 42 U.S.C. § 1983 Officer Stevenson, Chief Overweg, and the City of Mitchell violated Meyer's Second, Fourth, and Fourteenth Amendment rights. Docket 1. Defendants allege that Officer Stevenson and Chief Overweg are entitled to qualified immunity and there is no question of fact as to whether the City of Mitchell violated Meyer's rights.

I.  **Whether Officer Stevenson is entitled to qualified immunity?**

"Qualified immunity shields a law enforcement officer from liability in a § 1983 action unless the officer's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Dooley v. Tharp*, 856 F.3d 1177, 1181 (8th Cir. 2017) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)). "Qualified immunity involves the following inquiries: (1) whether the facts alleged, taken in the light most favorable to plaintiffs, show that the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

A. **Meyer's Second Amendment right.**

Kasselder alleges that Officer Stevenson violated Meyer's Second Amendment right to possess a firearm. Kasselder has not directed the court to any authority stating that an officer's attempt to secure a firearm constitutes a violation of the Second Amendment. In *Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011), the Eighth Circuit evaluated the potential for a § 1983 claim for

7

violation of the Second Amendment. In *Walters,* the plaintiff alleged his Second Amendment right was violated when the defendants legally seized one of his firearms and then failed to return the firearm to him. *Id.* at 316. The court found that plaintiff had a valid due process claim under the Fourteenth Amendment because he sought a process to retrieve his seized firearm. *Id.* And the court found that "[t]he defendants' policy and action affected one of [plaintiff's] firearms . . . [but] defendants did not prohibit [plaintiff] from retaining or acquiring other firearms. *Id.* at 318. The court, however, did "not foreclose the possibility that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm that he or she otherwise lawfully possessed for self-defense." *Id.*

Here, this court finds that Kasselder fails to show that Officer Stevenson violated Meyer's Second Amendment right when he tried to gain control of Meyer's gun. Viewed in the light most favorable to plaintiff, the facts establish that Officer Stevenson was attempting to investigate a noise complaint when he came across Meyer with a gun. Officer Stevenson's attempt to temporarily secure control of the gun while investigating the noise complaint would only prohibit Meyer from possessing a single firearm. Thus, the court finds that this situations is similar to *Walters* and Kasselder has failed to show that Officer Stevenson's conduct violated a clearly established constitutional right under the Second Amendment. Officer Stevenson is entitled to qualified immunity on the Second Amendment claim.

**B. Meyer's Fourth Amendment right.**

Kasselder also alleges that Officer Stevenson violated Meyer's Fourth Amendment right to be free from the use of excessive force. Excessive force claims are analyzed as seizures under the Fourth Amendment. *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006). Excessive force is force that is unreasonable under the circumstances. *Id.* The court evaluates whether an officer's use of force was reasonable "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In *Graham*, the Supreme Court stated that the test for reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch*, 689 F.3d at 965.

Kasselder argues that there is a question of fact as to whether Officer Stevenson's actions were reasonable because Officer Stevenson never identified himself as a police officer and did not have probable cause to believe that

9

Meyer was engaged in criminal activity when he approached Meyer. Kasselder relies on *Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir. 2013), to support her argument that Officer Stevenson's actions were unreasonable. In *Atkinson*, an on-duty police officer "bull-rushed" a man after a high school football game when the man was trying to break up a fight between other patrons. *Id.* at 1205. The police officer was on-duty but was not in uniform, did not have his gun or badge, and did not identify himself as a police officer. *Id.* The man spent twenty-four days in the hospital as a result of the injuries he sustained from being tackled by the officer. *Id.* The Eighth Circuit Court of Appeals found that "[a] reasonable jury could find [the officer] was an overzealous police officer who, without identifying himself as a law enforcement official, used excessive force . . . ." *Id.* at 1211. But the Eighth Circuit clarified that "[t]he 'linchpin' of our decision is not that [the officer] should have known the Fourth Amendment required him 'to identify himself as an officer before using force to carry out an arrest in public.'" *Id.* at 1213 (quoting *id.* at 1217 (Colloton, J., concurring)). Instead, it stated that there was "a genuine dispute of material fact whether any of the three *Graham* factors" justified the force. *Id.*

     Here, Officer Stevenson never identified himself as a police officer and has provided different accounts of the events leading up to the struggle over the gun. On one occasion, Officer Stevenson stated that he asked Meyer about the gun as he reached for it. Docket 20-3 at 22. On another occasion, Officer Stevenson stated that Meyer began to point the gun at Officer Stevenson before Officer Stevenson reached to secure the gun. Docket 13-1 ¶¶ 14-15. Officer

Stevenson also testified that he instructed Meyer to let go of the gun. Docket 16 ¶ 47. But no one reports having heard Officer Stevenson say anything to Meyer. Docket 17 ¶ 12. Also, Officer Stevenson had no reason to believe that Meyer was engaged in any criminal activity and Meyer was not resisting an arrest. Officer Stevenson argues that he believed Meyer was an immediate threat, but Officer Stevenson's inconsistent explanations create a question of fact as to Meyer's perceived danger. Thus, taking the facts in the light most favorable to Meyer, a jury could conclude that Officer Stevenson's use of force was unreasonable and violated Meyer's constitutional right.

The court must now evaluate the second step of the qualified immunity analysis and determine whether Meyer's right was clearly established at the time of the misconduct. *Dooley*, 856 F.3d at 1181. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In *Atkinson*, the Eighth Circuit found that "the unlawfulness of [the officer] charging [the man] 'would be clear to a reasonable officer[.]' " *Atkinson*, 709 F.3d at 1212. The court stated that any reasonable officer would not "have needed to 'consult a casebook' to recognize the unreasonableness of" severely injuring a man who was trying to peacefully stop a fight when the officer never identified himself as a police officer and never gave the man an opportunity to comply. *Id.* Thus, the court found that the officer was not entitled to qualified immunity. *Id.* at 1214.

In *Parks v. Pomeroy*, 387 F.3d 949, 958 (8th Cir. 2004), the Eighth Circuit Court of Appeals found that an officer did not violate a clearly established constitutional right at the time he used deadly force. In *Parks*, a husband and wife started fighting with each other after returning from a night out. *Id.* at 951. Eventually, the wife called 911 and two officers were dispatched to the residence. *Id.* The dispatcher told the officers that "It's a husband/wife domestic . . . the father is [drunk] . . . [a]pparently it's husband versus wife. The husband is [drunk]. Children are involved." *Id.* at 952 (alterations in original). When the officers entered the residence, one of the officers instructed the husband to leave the home and the husband refused. *Id.* At that point, the officer lunged at the husband and the husband deflected the officer. *Id.* The officer then sprayed the husband with Oleoresin Capsicium spray[1] and the officer and husband ended up in a physical struggle on the kitchen floor. *Id.* The officer yelled out, "I think he's going for my gun." *Id.* The second officer then drew his weapon. *Id.* The first officer instructed the husband not to reach for his gun and the husband responded, "I'm not. I can't see." *Id.* at 953. The standing officer then fired his weapon shooting the husband in the back. *Id.* The husband died moments later. *Id.*

The Eighth Circuit upheld the district court's finding that whether or not the officer acted objectively reasonable in the situation was a question of fact. *Id.* at 956. But the Eighth Circuit found that "the physical struggle . . . was

---

[1] Similar to mace.

hostile and intense, the circumstances were extremely volatile and potentially deadly, and the events were evolving rapidly." *Id.* at 957-58. Thus, at the time of the events the officer did not violate a clearly established constitutional right. *Id.* at 958.

Here, Officer Stevenson was struggling with a man over control of a firearm. There was not another officer immediately nearby, he could not radio for help, and he could not reach his own weapon. The situation developed quickly and was potentially deadly. Also, while Officer Stevenson did not verbally identify himself as a police officer, he was dressed in his uniform. The court cannot say that "every reasonable official would have understood that" Officer Stevenson's actions violated a clearly established right. *Mullenix*, 136 S. Ct. at 308. Thus, Officer Stevenson is entitled to qualified immunity.

**II.     Whether Chief Overweg is entitled to qualified immunity?**

Kasselder also asserts claims against Chief Overweg in his individual capacity and argues that summary judgment is premature because further discovery is needed. Because Kasselder named Chief Overweg in his individual capacity, he is entitled to an analysis of qualified immunity prior to discovery. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (discussing the distinction between individual capacity and official capacity suits). "A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation." *Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007). "The standard of liability for failure to train is

deliberate indifference." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.' " *Id.* (quoting *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322 (8th Cir. 1986)).

Kasselder has not identified what action Chief Overweg took that violated Meyer's constitutional rights. Chief Overweg was not present and did not participate in the incident on September 4, 2015. And Kasselder has not identified how Chief Overweg acted with deliberate indifference, failed to train, or failed to supervise Officer Stevenson. Thus, the court finds that there is no question of fact as to whether Chief Overweg violated Meyer's constitutional rights and Chief Overweg is entitled to qualified immunity.

### III. Whether the City of Mitchell's policies or customs violated Meyer's constitutional rights?

Kasselder also asserts claims against the City of Mitchell and argues that summary judgment is premature because further discovery is needed to identify potential unconstitutional policies and procedures. Municipal entities are subject to liability under § 1983 but not based on respondeat superior. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury . . . ." *Id.* at 694. Municipalities do not enjoy either absolute or qualified immunity from suit. *Owen v. City of Independence*, 445 U.S. 622, 650 (1980).

Here, Kasselder has not identified a specific policy, procedure, or custom that inflicted injury on Meyer. But because of Stevenson's claim of qualified immunity, Kasselder has not yet engaged in the discovery process that would yield the information needed to identify a policy, procedure, or custom. Thus, the court denies the motion for summary judgment as to the City of Mitchell pending further discovery.

**CONCLUSION**

In conclusion, Officer Stevenson and Chief Overweg are entitled to qualified immunity but further discovery is necessary to rule on Kasselder's claim against the City of Mitchell. Thus, it is

ORDERED that defendants' motion (Docket 10) is GRANTED as to Officer Stevenson and Chief Overweg. It is

FURTHER ORDERED that defendants' motion is denied as to the City of Mitchell. It is

FURTHER ORDERED that Kasselder has six months to identify and name Does 1–3. Failure to do so will result in the claims against Does 1–3 being dismissed.

Dated May 24, 2018.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE